May it please the court, counsel, my name is Sean Bruner. I represent Kevin Miles, who was sentenced to death for a murder he neither committed, intended to commit, or attempted to commit. The expert hired by the trial attorney, Dr. Levy, opined in his report that Kevin had a, quote, fairly normal childhood. Our investigation, which appears in the excerpts by our mitigation investigator, and is summarized in the opening brief on pages 1 through 4, found that his childhood was anything but normal. He was born to a prostitute who was beaten by her pimp during her pregnancy with Kevin. Kevin's adoptive mother, Lois Nash, convinced this woman not to abort Kevin and to give him to her. She then escaped from Oklahoma from Kevin's father, who was her husband, and the pimp of Kevin's birth mother. And she went to a small town, a racially segregated town in northern Arizona, where Kevin was raised in very unusual circumstances. Can I interrupt you? Yes, sir. Some of what you are saying, as I recall, is set forth, although not in quite that detail, in the presentence report that was available to Judge Tinney when he imposed the sentence. And then we have his factual finding that the statutory aggravators outweighed any of the mitigation evidence thought was offered on behalf of your client. In light of the Supreme Court's decision in Cullen v. Pinholster, I'm not sure we can consider the additional amplifying evidence that you are urging us to consider. Can you address that question for us? Well, certainly, Judge Talman. I think the reason why we can consider it is because we are looking at a situation of ineffective assistance of counsel. And if we look at the decision by the State court, which is the last decision from the State court, and we look on – it appears on pages 241 and 243 of the excerpts. And the judge there did not make a decision on the merits regarding this ineffective assistance claim that we're here on. He found that mere – the quote is, "'Mere allegations without more'--" Which judge are we talking about? Judge Brown. Judge Brown in the State post-conviction. In the State post-conviction. He found that mere allegations without more are not sufficient to show the defense counsel fell below the prevailing professional norms at the time of sentencing. Wasn't the long investigative report in the State court post-conviction record? This – what I'm quoting from, yes, is the 28-page mitigation report and Dr. Geffen's report, our expert in the post-conviction, were both before Judge Brown. And in terms of anything new before the Federal court, I think maybe there was a second Geffen report, but that's all we know. You're correct. Very good. There was a second Geffen report, and there was also a report by a Dr. Cochran. Right. And – but what I was alluding to just a minute ago is not things that came up in that. There's no pinhole-strip problem about that. I don't think there is any. And are we back to just straight AEDPA review as to whether or not the Arizona courts were objectively unreasonable in the conclusion by both Judge Tinney and Judge Brown, and I believe the Oregon – or, excuse me, the Arizona Supreme Court, that the aggravators still outweighed the mitigation evidence? Well, I think that – Is that an objectively unreasonable determination based on all this evidence? I think that it is an objectively unreasonable determination, and also, I think that Judge Brown did not apply legal standards as recognized by the Supreme Court. In the case of the – the Arizona Supreme Court, for example, as to the preparation of the mitigation, he said that – he said that – and this is on 243 of the excerpt – he said, This is not new evidence such as it would fall under the provisions of Rule 32e. Well, ineffective assistance claim as of right in your first Rule 32 petition is not subject to a new evidence standard. So he was wrong about that. And then he talks about Petitioner had this information. I read that statement to say that essentially it's just fleshing out what was already before Judge Tinney. Well, if you go to the next sentence, though, Judge Talman, it's – he says, Petitioner has had this information from the beginning and could have so informed his counsel in Dr. Levy. So that, I think, means that this is evidence that was – that was not presented to Judge Tinney, and I believe that if it had been presented to Judge Tinney, Kevin wouldn't be suffering under a death sentence right now. Well, that's what I'd like to ask you about, which is the prejudice prong of all this. I know you characterized the investigation as having found anything but a normal childhood, but when you look at this individual's social history compared to some of the really shocking and horrendous things we've seen in other cases, it may not be average, but it really is – it doesn't rise to that kind of level in my view. So I wonder if you can address, in view of the sentencing judge's assertion that the aggravators would outweigh anything except the most significant kind of mitigation, why you think that you can demonstrate prejudice here. Well, there are two reasons. For one thing, I think this was a close call to begin with. I think that a finding that he was – that he exhibited extreme indifference to human life – I mean, we have to remember Kevin was not the killer in this case. No, but he was the only adult, and according to the findings, he knew perfectly well that this other person was armed and was planning to go out and shoot somebody. Well, to accept those findings, however, we need to reject the fact that when Kevin made that statement, immediately upon that – making that statement, he said that neither he nor the co-defendant, Ray Hernandez, believed Levi Jackson that he was going to do that. And the judge – We have a finding to the contrary that we have to accept. How do you overcome that under the AEDPA standard? Well, I think that, for one thing, some of the things that Judge Tinney found were absolutely not supported by the record. I think they're absolutely contradicted by the record. With regard to that specific statement, he makes a specific factual finding that that claim that he didn't believe Jackson is disingenuous. And in part, he relies on the interview by the Tucson detective, which, as I read it, shows that the only time Mr. Ryan – or, excuse me, Mr. Miles – was truthful was when he was confronted with other evidence that he believed the police had against him. And on that basis, the fact that he was prevaricating during the interview, the trier of truth, is that he was not being truthful when he said he didn't believe Jackson. Well, I mean, the fact – what I'm referring to is after the interview did turn – you're absolutely correct about that – when they said that they found his shoe prints there. At that point, he – Kevin ceased to deny that he had been present at the time of the killing. And he essentially solved the case for them. I mean, the entire evidence of this case essentially comes from his statements taken from that point forward. So what difference would this additional social history have made in the State court's calculus? Well, I think that, you know, it's been recognized extensively, you know, from Wiggins v. Smith on down, that this sort of evidence is very, very important. In fact, crucial. And in all those cases where – But it's entirely fact-dependent given each case. It depends a lot on how bad was the background and how much of that had been revealed previously. So if there's only a slight bit of additional information, that makes a difference versus a lot. And if the background is horrendous versus just not so nice, that makes a difference. So give me specifics about this case. We know what the principles are. Okay. Well, I disagree with you, though, Judge Braber. I don't think that this is a case where it's just a little bit of extra information and that it's not horrendous. I think, you know, this young man grew up with his mother being a prostitute, living in this house behind this bar where the prostitution took place, where she worked out of, and he slept in her same bed with her while in the next room the prostitutes conducted their business, including – There were murders on site, as I understand it. Yes. He witnessed a murder of a prostitute there that the police called a suicide, and the police were involved in all sorts of corruption there. In fact, Sterling Norgard, who's a police lieutenant there, was one of the main sources of information for us regarding all of this. He said that all the prostitutes were heroin addicts. And so Kevin was exposed to an extreme amount of violence, sexual activity, wild sexual activity, drug use from a very early age. And as Dr. Geffen noted in his report, when Kevin did start using drugs, he became addicted very quickly to drugs. And he says that some of this had to do with Kevin's upbringing. In fact, comparing Dr. Geffen's conclusions to Dr. Levy's is, I think, very revealing. Dr. Levy, in his report, found only mitigating factors being remorse and using drugs quite heavily at the time. Dr. Geffen finds statutory mitigation for one thing, which is something that Dr. Levy did not find. He found that he met the criteria of incapable of conforming his actions to the requirements of the law. But you're not even arguing that now, as I understand it. I'm sorry? That was a separate point. Okay. My understanding is that you're actually not arguing that. That that was sufficiently substantiated. You're arguing for a different drug theory, but not that one. Well, I'm not arguing for the theory because there was not enough information that came out as to – well, let me phrase it this way. Kevin was not actively under the influence at the time he committed the murders. That's not to say that using drugs continuously on a daily basis to the extent that he was at that time doesn't compromise your thinking, because I think the evidence is it clearly does. But – I didn't even understand you to be saying that. I understood you to be – we're getting off topic now. I'm sorry. Well, I agree with you that the focus of our argument is the addiction. Right. And that his criminal behavior was driven by his need to get money. And wasn't there a State court case at the time saying that that's just not a theory? I believe that there was a case that you were on, in fact, that talked about the Williams v. Ryan case. Is that what you're referring to? I remember a case in which the issue was a different addiction theory, which was essentially that after a while, a very long-term use of drugs changes your brain patterns. But this guy wasn't really using drugs very long. He wasn't addicted very long. He was addicted for a relatively short time, as I understand it. Well, he was a relatively young man. I mean, he was addicted pretty much according to Dr. Geffen. He was pretty much addicted from the time he started using drugs. But, yes, because he was only 21 years old, I imagine that – But I thought his actual addiction to crack cocaine was a matter of months. I don't know precisely the amount of time, but I think you're right. It was not a very lengthy addiction, but I don't think addiction to crack has to be very long. What I was referring to is a case called State v. Green that says while it's true that there was a causal connection that would support a claim of mitigation, to hold that a motivation to kill fueled in part by desire for drugs as mitigating would be anomalous indeed. But I think that the Supreme Court cases are clearly opposite that. Sears v. Upton, Porter v. McClellan, Wiggins v. Smith. I think the Supreme Court is – But that was a 1998 case. So the State law at the time – I don't know if there was an earlier case, but there was certainly nothing in State law at the time that would have supported it, right? No. That's absolutely correct. Counsel, I'm still having a hard time. I'm looking at excerpts of record 757, which is the pre-sentence report. Yes. That Judge Timming had. And in particular, the attribution to the defendant that at the time of the offense, the defendant indicated he was not in his right frame of mind, that he was coming down from crack after having been using it four or five hours earlier, that he wanted money for drugs and so on. And then I look at ER 507, which is the mitigation aggravation hearing. And the Court specifically finds, beginning at line 12, that the Court finds that there's no credible evidence that the defendant's capacity was impaired or that drugs or alcohol had impaired the defendant's thinking or actions at the time of the crimes in question. Why isn't that a factual finding to which we must defer under EBP? Well, because I don't think that the expert witness was able to testify. I mean, I think there's a profound difference between a report coming from the defendant in the pre-sentence report and an expert witness of the caliber of Dr. Geffen getting up and explaining his reasoning behind this. I mean, Dr. Geffen did a number of tests on the defendant. Dr. Levy did not. In fact, in Dr. Levy's pretrial interview with the prosecutor, he said, I was not asked to do an extensive evaluation. And I think that's very telling as to the ineffective assistance that we're arguing here. I also found that that was as a result of a strategic choice by Barbara Sattler, the defense lawyer, who concluded that because the Arizona trial judge at the time was the sentencer, the fact finder with regard to whether death was appropriate, that it was her judgment that that kind of information would not be effective with most judges in convincing them not to impose the death penalty. And so she chose a different tact in her defense. Doesn't the Supreme Court case law under Strickland tell us that we have to give substantial deference to counsel's strategic choice? Well, we certainly have to give deference to strategic choices, but Strickland says that if strategy is only strategic, if you do the proper investigation to make that assumption. And that statement by Ms. Sattler is disingenuous. It's in hindsight, because if you look at her statements at the sentencing and what she attempted to do in the aggravation mitigation hearing, that was very much the focus of what she was trying to do. And I've quoted her extensively in that. It was only years and years later during the deposition that now she says, well, this was a strategic choice. I wanted to focus on other things. But if we look at the transcript of her examination of Dr. Levy and her statements at the sentencing hearing later to Judge Tinney, we find that there was no other strategy, there was no other questioning she did of Dr. Levy to establish anything else. As I understand it, her strategy was the argument that you opened with, and that is that he did not reasonably believe Jackson when Jackson laid out the plan that ultimately was carried out on December 7, 1992, and that he was essentially a minor participant who did not fire the fatal shot and essentially should not be held criminally liable for the death. That was her strategy, wasn't it? Well, her strategy, if you can call it that, is I think evidenced in her sentencing memorandum where she barely touches on mitigation. I agree with you that she did make those comments, but I thought that was in relation to her argument that cruelty should not be found in the case. I didn't know that she ever laid that out as mitigation. In fact, her mitigation argument was almost nil, and the reason it was nil is because she did no investigation, and she did not. My understanding is, with regard to the investigation, it does seem to me that there was a great or a fair amount of quite new information that did put a different cast on his whole upbringing, but the State trial court in the post-conviction proceedings didn't really say otherwise. What they mainly said was this isn't new because Kevin knew it all along. Correct. So what about that in terms of the case law, the clearly established Supreme Court law at the time? Well, the clearly established Supreme Court law at the time that Judge Brown in 2001 made that was, you know, Rompilla v. Beard. Porter came later, but that theory that you have to rely on the defendant himself to give you all the mitigation that you need has been clearly rejected, and the ABA guidelines, in effect, at the time that Ms. Sattler was doing this case said quite clearly you need to do an extensive mitigation investigation, and Ms. Sattler, in her deposition, said, well, I didn't think, you know, that Winslow was any different than any place else or any more racist, and I didn't see the point in going up there. And, you know, in fact, they did nothing. They made a few phone calls. There's nothing in the record to suggest that Kevin was asked this stuff. I mean, it's not that he said otherwise. He didn't mislead them. Correct. Or there's nothing in the record to suggest that, is there? No, there is not. And in fact, as Judge Talman was pointing out, the pre-sentence report was actually more in-depth than the investigation by counsel. That's why I'm concerned about prejudice, because in the pre-sentence report, there is a great deal of mitigation suggested, several issues. The defendant's capacity to appreciate the wrongfulness of behavior and conform behavior to the requirements of the law was impaired by substance abuse and or depression. I'm going to skip some things. Participation may have been less than the accomplice's. Aspects of his character, such as graduating high school and most of his military service, show potential for rehabilitation. His actions may have resulted from a lack of family stability and or a dysfunctional home environment. He expressed remorse, and it goes on and on. So those factors, at least, were in front of the sentencing judge from the pre-sentence report, including having a dysfunctional family. So with the trial court having looked at that and saying, that doesn't persuade me, I guess I'm still under the AEDPA standard. We have to say that the State court was unreasonable in saying there wasn't prejudice, and I just am having difficulty getting over that AEDPA burden. Well, I appreciate what you're saying, Judge, but I think that had we been given the opportunity to have an evidentiary hearing, which we were clearly entitled to under Arizona law in the Rule 32 proceeding, had we been given that opportunity, we could have addressed that very issue. I mean, I think at the very least, what the pre-sentence report shows is the deficiency in Barbara Sattler's investigation into mitigation. But as far as I can tell, the pre-sentence report, at least as to his social history, basically just recited the legal report. Yes. I think you're right. I mean, the detail that we ---- But there really wasn't anything additional. And it was just ñ and when he said dysfunctional family, the only thing that backed it up in terms of facts was the social history that said that his adopted ñ he had an adopted mother who was an alcoholic and waited, cooked, waited tables and worked at a convenience store before becoming a nursing home administrator, didn't say that she was a prostitute, a madam, lived in a house where there were a couple of murders, left him in places while she was going around turning tricks and so on. So it was ñ there were no facts to support, you know, the fairly bland statement that he had a dysfunctional family, which can be a rather wide range of things. The only facts were the legal report, nothing else. I agree with you wholeheartedly on that. What about the witnesses that Ms. Sattler called during the mitigation hearing? She called two in addition to ñ Address some of the social history. Did they not? Well, I don't think they did, Judge. I think that the social history that we got out of some of the same members of the Mayberry family was much more in-depth. I mean, they tried to basically paint a picture of Kevin that he was a nice guy. I mean, it was sort of good character evidence is what was ñ Which can be mitigating. And that's an ñ I mean, it seems to me a strategic decision. Do you want to paint your person as a basically nice guy who got caught up in something and is really sorry that it happened? Or do you want to paint him as, you know, coming from a horrible home life? That's a choice. But it's only ñ it's only a reasonable choice if you're aware of the option, which Ms. Sattler was not. She never did an investigation. Well, I have a hard time agreeing with that statement, given her choice not to emphasize the fact that he was a drug addict and to lay it off on the drugs, because she didn't think that it would be effective in convincing the sentencing judge to mitigate the punishment. Excuse me if I don't answer at this time. Could I reserve the rest of my time for rebuttal? You can leave that as an unanswered rhetorical question. But if you have no answer to it, I guess you have no answer to it. Well, I'd like to have a little rebuttal time. You may save your time. You don't have to answer. We'll draw whatever inference we can from your failure to answer my question. May I please record? I'm Jonathan Bass. I represent the State of Arizona in this case. Good morning. When Judge Tiddy imposed the death penalty in this case, he was well aware of Kevin Miles' drug history. He was aware that the day before the murder, Miles had said that he had used crack cocaine and alcohol, that on the day of the murder, he was coming down from that high, although he didn't use any drugs the day that Pat Barrowland was killed. He was well aware of Kevin Miles' background. He knew that three months before, Kevin Miles' life had essentially unraveled when his wife had left him, his mother had died, and he'd lost his job and his apartment. But he wasn't aware of, and didn't mention at all, unless you can show me where, in his very complete summary of his – of the mitigating and aggravating factors, anything about Kevin Miles' early life. What he knew about his early life, Your Honor? Well, first of all, did he mention anything when he was summarizing the mitigating circumstances? I'm going to have to go back and check precisely exactly what the facts that he mentioned were. I'm quickly looking. I don't think so, but maybe there's something. Well, he knew that – he knew this much. He knew that Kevin Miles had – was essentially a self-indulgent, pampered young man. He graduated from high school. He was somewhat of a lady's man. He was not addicted to drugs when he was living in Winslow, that he had joined the Navy, that he had had some success in the Navy, but that he had ultimately been discharged administratively. He knew that Kevin Miles was not fond of working. He knew that Kevin Miles had, I think, a basketball scholarship that he had essentially refused. He knew that Kevin Miles had not taken any cocaine or crack until just several months before these murders. I was – have you read the recent case of James v. Ryan? Your Honor, not enough to intelligence. It just came out relatively recently. Now, James was, I believe, not an – I was on the case, but not an AEDPA case with regard to the penalty phase, and that may be enough of a distinction. But the actual facts in terms of early history, which were found – which the AEDPA lawyer did not bring out of trial and which came out afterwards, was sort of eerily similar, actually. Have you looked at it? Your Honor, not recently. I'm sorry. It wasn't a doctor's child who had a very difficult early – very early life, and someone – and really not all that different in many ways, except for the AEDPA overlay, which is significant. It seemed very similar. Now, so you're not – when you're talking about what the judge knew, you're not talking about any of that, about the – his actual circumstances growing up with his mother. I think that there are some details that were filled in later in the material submitted to the PCR report. They're fairly significant. And his mother was a prostitute who essentially ran a house of prostitution where there were murders and drug use and was left in bars and fast food places while she turned tricks and so on. Well, those are the allegations. But also, I think it's undisputed that however his upbringing was or what the exact details of his upbringing were, he was much loved by his mother. Given – even if we accept those circumstances as true, he was loved by his mother. He was pampered by his mother. But somewhat ignored by her. He was sort of wandering around with nobody supervising him after a very young age. He – I suppose if that had come before the sentencing court, there would have had to have been some explanation as to what effect it had on Kevin Miles. I mean, he still managed to bring the question to us. But it wasn't before the sentencing court, which is the point. No, but – but Barbara Sattler knew that Kevin Miles had an upbringing that wasn't completely normal. Whether she knew every detail that later came out before the PCR report, I – I don't know. But she certainly, according to the State PCR report and the District Court Fiscal Bureau investigation, there's no indication here that there were any red flags that came to her attention that she ignored. And as was mentioned earlier, her – her – her whole defense at – at trial to the jury had been that his participation in this crime, in the murder, was extremely minor. He had committed the armed robbery. He had committed the kidnapping. She told the jury that in opening statement. She said that he was as surprised by what Levi Jackson did as anyone. He didn't believe that Levi Jackson was actually going to go through and – and kill this woman. Now, the jury rejected that and the – and the sentencing court rejected that. And so at – in mitigation now, she's got to, I think reasonably, present information that isn't terribly inconsistent with that kind of defense. She doesn't have the information, frankly, to present him as some kind of a crazed drug addict who was hell-bent on – on committing this crime so that he could get money for drugs. Remember that in September of 92, three months before, Miles had lost his wife. He lost his job. He lost his apartment. He lost his mother. He was living hand-to-mouth at this time. He did need money. And in fact, in November of 92, a month before the murder, he finally, finally turns to crime. And he starts committing armed robberies. Now, whether he's getting money for drugs, debatable. He needs money to live. He needs money to pay rent and eat. When he said he was getting – using all the money to buy drugs before he'd buy anything else, but is that your estimation of mitigating factor? No. I don't think it's a mitigating factor. Or it could be, but the judge didn't have to take it as such. It could be presented that way, I guess. But – but it certainly isn't compelling mitigation. It's a factor about his life, but it isn't compelling mitigation. So Ms. Sattler has a choice. She can present Miles one way or the other. And apparently, she wanted to present Miles as somebody who was worth saving. He was, in her argument, not heavily involved in the murder of Patricia Bauerlein. And her mitigation had to be consistent, I think, with that argument. She also had Dr. Levy. Dr. Levy had talked to Miles for a couple of hours. He had a fair amount of information about Miles' upbringing. Well, she surely did a terrible job with Dr. Levy. I mean, I don't know where that leads you. But, you know, he was not qualified to testify about what he was testifying about, and he hadn't done any inquiry, hadn't done any testing, and he didn't know anything. Your Honor, I understand what you're saying, but I also say that Dr. Levy, he was a qualified psychologist, very experienced psychologist. But he wasn't qualified about drug addiction or use of crack cocaine at all. He said he wasn't. The only thing he didn't know was the amount of cocaine. No. What he didn't know was anything about, particularly about the effect of crack cocaine on anybody. He might have been able to apply about that, but he didn't have any specific information in Kevin Miles' case to say that on the day before, for example, he'd used X amount of cocaine and that that was going to affect him this way. He didn't have that information. Now, we had talked to Miles. Miles didn't give him that information. But it doesn't seem to me to matter at this point, because nobody is really claiming that he was intoxicated right now. And so, and there's no evidence in the record that he was, so I don't think it matters. But in terms of whether she was ineffective, I think she was terribly ineffective as to that point. Well, Dr. Levy was still able, based on his psychological expertise and what he knew about the case, to opine without really any qualification that Miles knew right from wrong, that despite the depression that had been diagnosed, Miles was still able to conform his conduct to the law. Miles was not acting impulsively. These were not terribly helpful conclusions from Dr. Levy. I admit, but they were his honest conclusions, and that's what Barbara Sattler had to work with. And it was, frankly, consistent with her trial defense. I'm not saying that she went out and sought this kind of advice, but she didn't argue that Miles was unable to control himself during this time. In fact, she kind of portrays Miles as being almost sort of hyper-reasonable. I mean, he's sure he's participating in an armed robbery and a kidnapping. He's doing terrible things. But when Levi Jackson says, we're going to take somebody out in the desert and shoot them, he's savvy enough, reasonable enough, to realize in her mind that, no, that's not going to happen. This is a teenager who's just bragging about what he wants to do, and it'll never take place. He was able to conform himself, and that was her trial defense. And so she was able, through Dr. Levy, to get Miles' mental state on the day of the Well, she seems to have wanted to argue that he was incapacitated or at — and she even did in closing argument, but she just didn't have the facts, which is what the district judge said. I agree. And she also, I think, made that argument in her sentencing memo. And in her deposition, she — although she was quite lucid in defending everything else she did, she — and, you know, somewhat convincing.  Well, she — I have a couple of things to say about that. She — I'm kind of in the awkward position here of saying that I think that under Cullen v. Penholzer, her deposition is not really something that should come before this Court. That was — Was that not before the State court? Yes. I'm sorry. What was the question? That was not before the State court. It was not before the State court. It was done 12 years after the fact, 2004. It was presented only to the Federal court. Now, the district court did cite to the — her deposition, as did I in my brief, before Penholzer came out, because it does provide a little bit of insight into what she remembers her strategy being, but I've got to say, to be consistent, that we would This is a question about the State court's position on penholzer's case, but I'm not going to answer it now because I'm still trying to absorb Penholzer. If — what happened here, as I understand it, was they were told there was going to be — they put a certain amount of evidence in the record. They were told there was going to be an evidentiary hearing, and then the trial judge says, okay, no evidentiary hearing, I'm going to rule. Now, does it matter that — does the State procedure matter at all with regard to the penholzer question? I mean, that — the argument that's being made, as I understand it, is, well, there should have been an evidentiary hearing under State law, and we expected one, so we didn't shot — we put on enough to get the evidentiary hearing, and we didn't shoot our wad in terms of what else we could have put on. And it's not fair to say you only look at the State court record when the State court record was truncated. Now, at what point does that become a viable argument or does it ever become a viable argument? Can the State simply control the state of the record, the State courts, and then say, but you're limited to that? I think that — no, I don't think so. I think the State court record is what the State court, in a way, says it is. I mean, if the State court doesn't believe that there should be an evidentiary hearing, then there is. Kagan. So suppose the State court rule was no evidentiary hearings ever. You have to put everything on initially, your first submission, and that's all we're going to ever look at. Well, that would be inconsistent with Rule 32, which provides that there will be an evidentiary hearing if there's a contested issue. If there's a colorable claim, then the trial judge can't do it. Right. I understand, and I'm trying to understand the parameters of this. I mean, for example, if the trial judge here said, as he did, there's no colorable claim as to the — I understood him to say — as to the social history questions, not because it wasn't significant additional information, but because Kevin knew it and therefore it's not new. Now, if that's just wrong as a matter of constitutional law, let's say, and I think it is probably wrong, then what? Then we just look at the — nonetheless stick to the State court record, even though it was refused for a wrong reason? No, because I think — well, I think you would still look at the State court record. I think you might draw a different legal conclusion. You might conclude that the State court didn't act. But he never — they never got in anymore. He says they could have gotten more in and just put enough in to get by the standard and then they were thwarted. Well, that's sometimes a strategic decision based — that the PCR counsel uses. I mean, I — in this case, for example, in fact, it's very common today in Arizona and I'm sure elsewhere that the parties, when they prepare for a PCR, will go to the defense lawyer and find out what his or her thoughts are. If they're helpful to the defense, they might be submitted. If they're helpful to the State, they might be submitted. I don't know the timeline of this case back in — when this PCR was being prepared, but there's certain — Barbara Sattler was certainly, as far as I know, in Tucson, Arizona, and she could have been consulted and she could have been deposed at that time. I don't know what happened. Now, why she wasn't, not for me to say, but it didn't go before the State. So was the additional mitigation evidence, that was before the State court, correct? The report? Yes. And the addendum to the report? Were those before? I believe all of that was before the State, yes. So what did Judge Brown do? He called a status conference and said to the parties, who are you going to call if we hold an evidentiary hearing? And they said, Dr. Levy, Dr. Geffen, and I don't know what else they told him. And then he looked at — took that under advisement, looked at the supplemental expert reports that had been submitted, and then said, look, I've considered all this. I don't need a hearing to resolve it because I find it doesn't meet the requirements of Rule 32 and wouldn't have made a difference. Right. I think that's right. I mean, he — there's indication in the record that maybe he was going in the direction of a hearing and then changed his mind once the information was submitted. Was counsel, previous counsel, ever listed as a witness in that process? I'm not aware that she was. In fact, I don't — I won't say 100 percent. I didn't find anything. Your opponent is shaking his head yes. Okay. I'm not standing on firm enough ground to say that she wasn't. But the information that she could have given was certainly not submitted. What do we do with the fact that Ms. Sattler, at the mitigation hearing, wanted to call the ex-wife, but Miles refused to permit that? Does that play into the finding that he was withholding information? I think to some degree, yes. I mean, I think that — I think that the defendant in this case, or in these cases, does have some control over what kind of mitigation or if mitigation is presented at all. And if he doesn't believe that his ex-wife is going to be helpful to him, she had a lot of damaging things she could have said. And, in fact, it does come through. So one can understand maybe why he didn't think she was going to be a very helpful witness. I suppose Barbara Sattler could have overridden that. But the fact that she did not is not evidence of any ineffective assistance here. There's nothing that she would have said or wouldn't have said that they're relying on now. I mean, in other words, the Petitioner is not now — I mean, he's complaining about that, but he's not actually saying she would have said X. There's no information from what — as now is what she would have said or called. Right? What she would have said had she been deposed at the time? Yes. Had she been called, no. No. No, because before Pitholster, I mean, I think this would have been reasonably, you know, before the Federal court, you know, you would have taken into account that she was deposed 12 years after the fact and had to remember. And I'm sure you've read the deposition, and you can see that she — there's a lot that she doesn't recall. But it could have come in. Routinely now, it does. But as for the part that interests me about his early life, she didn't know anything about that anyway, right? About his early life? No. I wouldn't go that far, Your Honor. I wouldn't say she didn't know anything about it. I think she — she may not have known every detail that later came out on the subject. He met his mother. She had met his mother at some point much later. Right. And the mother was dead at this point, so she couldn't be interviewed or something. But she had met the mother. The wife had met the mother. Right. And the ex-wife and Miles were certainly not on good terms. Had Judge Tinney also been the sentencing judge on the three armed robbery charges? Yes. I think he was. Yes. He pled to that. Because we have two separate sentencing reports, one of which goes into a little more — the one involving the armed robberies goes into more detail on social history. I'm referring to 770 — 757 to — or maybe it's 770. 772. Yes. 772 to 74. He knew about that. He knew about the information in that report. Let me point out one more thing, too, and that is that, you know, the allegation is that a substance abuse expert here would have been the appropriate expert, not Dr. Levy. But in the PCR hearing — or not hearing, but in the PCR proceeding, the defense shows Dr. Geffen. Dr. Geffen isn't a substance abuse expert. He's simply another psychologist. Now, his conclusions differ from Dr. Levy, but that isn't sufficient for relief in these cases where you simply get another psychologist to examine the defendant perhaps a little bit more in detail. And perhaps at that point, the defendant gives a little bit more information about his drug use, and then you get a different conclusion and say, well, Barbara Sentler was ineffective because she didn't use somebody like Dr. Geffen. She used a psychologist. A substance abuse expert here wouldn't have provided any kind of helpful information in my opinion, one, because there wasn't much to work with. There's really not much evidence here of addiction or the kind of compulsive behavior or cognitive problem that you associate with crack cocaine. Well, it seems actually that there was a fair amount of evidence, but for that the judge could just figure it out for themselves. I mean, the guy was apparently running around for the last month. His life had fallen apart. He was smoking crack every day, he said. He was running around for the last month doing armed robberies to feed his habit. I gather that was all before the judge at the time, and I don't know that it takes a lot of – if the argument is that he was addicted and therefore was obsessively trying to get money to feed his addiction, which seems to be the argument, that that was all there pretty much without an expert. Well, it was there, and I don't want to maybe quibble over whether he was addicted or not. I mean, he was using it, but there were – there were a lot – there was a lot going on in his life, and he needed money for a lot of other reasons than just drugs. He liked to party. He liked to play around. In fact, after the murder, and when he takes off in Pat Marilyn's car and uses her ATM card and credit card and so on, you know, what does he do? He doesn't run off and buy a bunch of crack cocaine. He shows off the car, and then he goes to Phoenix and buys clothing and kind of plays around and parties for a while, and then he gets caught. That, I think, is what Kevin Miles was all about. I mean, that's who was before the sentencing court, that kind of person. But no, what bothers me – the one piece that bothers me is that the explanation for why he was like that didn't come in, really. The explanation for why he might have been like that, i.e., a more extreme early life than what is portrayed, considerably more, was not before the court. There may have been some details, certainly, that were not before the sentencing court with regard to his upbringing. But again, I think you've got to look at it in two ways. One, did Barbara Sattler see these details and overlook them? I don't think the record shows that. Well, it doesn't show she didn't. No, but it shows that she went. She made a reasonable explanation or investigation. The district court found that she had. What evidence is there that she made an investigation? She hired an investigator. Right. And what did he do? That investigator talked to a number of people. They certainly talked about all they could get. Didn't go to Winslow, Arizona, where he grew up. Didn't talk to the people he grew up with. Didn't talk to his high school people. Didn't talk to – He did talk to them. Didn't try and find out about his original family from Oklahoma. Didn't seem to uncover the basic fact about who his mother was and what she was like. They uncovered – they did talk to people from Winslow. Barbara Sattler did say in her deposition, and I probably shouldn't be going there because I'm arguing that I don't think you should consider it, but – I can't hear you. I'm sorry. I'm sorry. I don't want to – she did say some things about Winslow in her deposition, but I'm also in the position of saying don't consider that. She did – she went as far as I think she reasonably could have gone, and could she have gone further? And I think, well, maybe. And in every case, after the person gets the death penalty, sure, maybe you can uncover a little bit more than you did at the time. But I think that it's fair to call that kind of evidence rather cumulative. I mean, because you still have the facts that Kevin Miles' upbringing was maybe somewhat kind of normal or different, but what harm did it cause? I mean, he graduates from high school. He's raised by a mother, despite all of her flaws, who loves him. He may see what's alleged in terms of abuse and violence and so on, but he doesn't suffer any of that. He's a popular boy. He doesn't use drugs. He uses alcohol not to excess, like many teenagers do. I mean, certainly there may have been factors in his upbringing that were – that were strange and nothing that many of us are used to. Don't know people like that, perhaps. But what effect did it have on him? He was a relatively normal person. A report from the original investigator in the record? I see. Or is there just the Barbara Sattler memorandum? Martin Levy. No. I think there's some information in there from Phyllis Howell as to who she spoke to, if I'm not mistaken. Okay. But again, this information had to have come from somewhere, and there were people. There were friends of Kevin Miles who testified at trial and who testified at the sentencing hearing. They knew him. They could provide some perspective. In fact, they're the ones who said that when Miles sort of referred to the murder to them, they knew him well enough to know that he probably was not telling the truth, that maybe he was joking or something. So they had – there were people that Judge Tinney was aware of who had known Kevin Miles for some time and could provide some perspective on his life. And I – you know, I could go back and say, too, that whatever deficiencies there might be in the record were known to Kevin Miles. Many of them, anyway. And he could have presented this information to Barbara Stantler. But it's got to be taken in context. I mean, he's being portrayed by her as a very minor participant in this affair, not as some compulsively crazy drug addict who can't control himself and who had such a horrible childhood that he deserves mercy. He deserves mercy, in Barbara Stantler's opinion, because he was not involved much in this crime and that he's a relatively good boy who should be saved. He's remorseful, she says. So she's got some conflicting evidence to work with, but she makes a strategic choice and goes forward with it. At this point, if there are no further questions, I can address the other two issues that the Court asked for supplemental briefing on, the Tyson issue and the finding – the cruelty finding. But to be frank, Your Honor, I'll do that if you have any questions about that, because I think that those issues are – Why don't you do it briefly? Okay. Starting with cruelty. The issue is whether – well, first of all, you've got really two prongs of that, and I'll make this very quick. The first prong is that you can find cruelty if the victim – under Arizona law, if the victim consciously experiences physical or mental pain prior to death and the defendant knew or should have known that suffering would occur. Well, even Miles agrees that the victim here experienced mental pain prior to death. There's no question about that. Did he reasonably know it? Of course he did. He was involved in a crime, carjacking at gunpoint, that was designed to terrorize the victim. They take her out to the desert. It's a 30-minute – a long 30-minute drive out into the middle of the desert for only one purpose. He knows she's going to be killed. She knows she's going to be killed, I would submit. And she's scared to death. He knows she's going to be killed. One thing that was not really clear to me from the record ultimately was the district judge had an account in his sentencing colloquy about how he saw what had happened in two ways. First of all, he said that Miles had the gun in the car and his finger on the trigger. I remember the part about the gun in the car. I don't remember the part about the gun and the trigger. Was that in the record? Yes. Miles, well, you know, Miles goes to the point in his confession where he's implicating himself and then he pulls back. He does admit that he held the gun on the business end. I mean, he held the gun. He held the gun, but the judge said he had his finger on the trigger. I think there's a reasonable inference from holding the gun the way Miles described it, the way he held it. I think he actually admitted that in the interview by the Tucson detective, that he had his finger on the trigger. All right. And similarly, he had a very evocative and disturbing scenario going on at the scene of Miles standing right nearby. And I couldn't tell from the record whether Miles ever actually – at some points he says he was in the car, at other points he says he was out of the car. But did he ever place himself where the judge thought he was, looking at the whole thing and watching the shot as opposed to not watching the shot? Yes, he does. He admits that he watched her die. He was – yes, he's inside the car sometimes, he's outside the car. He certainly admits to urinating outside the car while she's being terrorized by Levi Jackson, in his words. So yes, he was close. They weren't very far away when she was shot. He was outside the car during that time. He says – tells his friends – the way that he describes the murder later to his friends, he says, yes, I saw her fall, I saw her shot, I saw her fall, and then she falls down, and then they drive away. And that came out in testimony from the friends? Yes. That's all before the sentencing court. It's also in the interview by the homicide detective. Right. Definitely, it's in there. And so, sure, he – her cruelty is definitely something that he reasonably knew would have – or the mental anguish that she experienced is something that he reasonably knew would occur based on his actions. And I've got about ten seconds, but I – Tyson, those findings also, I think, are very supportable. He was clearly a major player here. He was clearly indifferent to her – that power line and to her life. He watched her die. He was completely indifferent. And my time is up. So it is. Thank you, sir. And I believe, Mr. Bruner, you have some rebuttal time, about four minutes plus. Thank you. Let me just briefly address some of the points that were brought up here. The idea that Barbara Sattler had made a choice as to what to present and not to present his dysfunctional childhood I think is incorrect. There was no – nothing in the record suggesting she ever did an investigation that uncovered any of that. There was no investigator memo, as Judge Berzon asked. Miles didn't refuse to have his ex-wife called as a witness in her deposition. Ms. Sattler claimed she didn't even know why she hadn't called her. Well, she said at the time that he said – that he did that, very distinctly. And she said later that she didn't really remember. So more likely, or at least somebody could conclude, that she was right the first time. Okay. Well, counsel, counsel. Counsel, I'm looking at page 492. Okay. In which she says, the other thing I would like to put on the record, it was my intention to call Tammy Miles as a witness today. My client requested she not be called. I would just like to put on the record that was the reason she was not called today. And the court asked, because your client objected to it? And her answer is, that's correct. All right. Well, I stand corrected. That's from the trial. That's during the trial. That's from the actual transfer. That's a trial. Right. That's a trial. So presumably her memory was pretty good. Right. Okay. All right. But that was not – she didn't – that was during the trial as a character witness as opposed to the sentencing. No, this is the mitigation trial. That's the mitigation hearing? June 21, 1993. All right. Well, I stand corrected on that. But in any case, there was no investigator memo. There was no – nothing done by the investigator. Every single piece of information I got about the investigator is included in the excerpts, and it amounts to just a pitiful showing. In fact, this investigator didn't even remember Kevin Miles. Now, I've been doing this 30 years. I don't remember every client I ever represented, but I certainly remember all the death penalty cases I've ever done. It was just scandalous, I think. Counsel said – So do we have in the record, if we don't have a memo from the investigator, do we have any account of what the investigator did? The account of what she did came from the memos back and forth between her and Ms. Sattler, which are all contained in the excerpts of the record. I see. Okay. And it amounted to her interviewing, I think, five different people over the telephone is what the entire thing amounted to. Counsel said that – For example, this woman, Eleanor, whoever, Renfro, the woman that gave a lot of information. Right. Elaine Renfro. She was never interviewed by the investigator. The investigator interviewed three members of the Mayberry family who were very close to Kevin. She interviewed his basketball coach and maybe one other person. Well, she – and Tammy Miles she interviewed. But – And the girlfriend. I don't believe she interviewed Denise Renfro. She may have. I know that Ms. Sattler was certainly aware of Denise Renfro. Denise Renfro could have shed light on Kevin's drug use at that time, but that never came into the record. I just wanted to comment on one thing you were asking about, the evidentiary hearing. The State actually not only conceded in their pleading – I think it was on page 370 of the excerpts. But they actually, in their prayer, asked that the evidentiary hearing be conducted. And the judge asked at the hearing – then they said they wanted some – something about the scope of the hearing. And the judge asked who I was going to put on. Are you talking about in State court or in – This is State court now. I'm limiting all my arguments to State court. Okay. And before Judge Brown. And Judge Brown asked me, and I said I was planning to call Barbara Sattler, who under the rules of Rule 32 I cannot depose, contrary to what counsel said. There is no mechanism for any discovery under Rule 32. I was going to call her. I was going to call my mitigation investigator. And I was going to call Dr. Geffen. And I believe if I had been able to do that, I would have gotten into the record a lot of the reasons that we're talking about here and the prejudice prong would have been adequate. So how do you understand Penholster to operate under those circumstances? Well, since the judge – I don't think this was a decision on the merits, so I don't think Penholster applied. Well, what did the judge have? Didn't the judge have the reports? Hadn't you lodged those with the judge? Yes. The mitigation report, yes. That's what he looked at when he took it under. The mitigation expert's report, Dr. Geffen's report. Correct. But he said that mere allegations were not enough to find by a preponderance of the evidence that she had committed ineffective assistance of counsel. And that's an arbitrary, unconstitutional decision, because that Rule 32 only requires a colorable claim and the allegations are taken as true. And so he was applying a legal standard that doesn't exist. So what are we supposed to do now? Are we supposed to go behind that and say he erred under State – I mean, I'm asking this because I find it extremely both important and undetermined and confusing. Are we supposed to decide that he was wrong under State law? Probably not. Well, no. But under Robinson v. Schiro, which has survived Penholster, it wasn't one of the cases remanded to this Court in light of Penholster. Under that case, it violates the Eighth Amendment if it's an arbitrary procedure. And certainly, you can look to State law being arbitrarily applied where they're denying an evidentiary hearing where we would have brought forth all this prejudice that Judge Graver was talking about. We would have brought that all forth. So after Penholster, I mean, presumably you didn't know to do this, but after Penholster, you would bring a separate Eighth Amendment claim that the State court procedures were an Eighth Amendment violation. Well, I think we did. We did state that. And, you know, I mean, in our – in our – To exhaust that? Well, I mean, we did bring it up in the habeas corpus. That was a separate issue, and it was even raised before this Court as a separate issue, although I think it's assumed as a denial of the evidentiary hearing. It's an uncertified issue. Yes. And but – but it was brought up in the habeas. In the federal habeas? In the federal habeas, it was brought up that we were denied illegally the evidentiary hearing in State court. But not before the State? Well, yes. No, we perfected our claim that we were entitled to an evidentiary hearing. And the State agreed with that. Thank you, counsel. Thank you very much. The case just argued is submitted. We very much appreciate the thoughtful arguments from both counsel. And we will be adjourned until 10 o'clock.
judges: Graber, Berzon, Tallman